IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| eTOYS DIRECT 1, LLC, et al.,[1] | ) | Case No. 08-13412(BLS) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

## DISCLOSURE STATEMENT WITH RESPECT TO
## JOINT PLAN OF LIQUIDATION OF THE DEBTORS AND
## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Counsel for Debtors and Debtors in Possession:

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
Jeffrey W. Dulberg (CA Bar No. 181200)
Michael R. Seidl (Bar No. 3889)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
Telephone: 302-652-4100
Facsimile: 302-652-4400

Counsel for Official Committee of Unsecured Creditors:

ARENT FOX LLP
Schuyler G. Carroll
1675 Broadway
New York, NY 10019
Telephone: 212-484-3900
Facsimile: 212-484-3990

-and-

ELLIOTT GREENLEAF
Rafael X. Zahralddin-Aravena (Bar No. 4166)
1105 Market Street, Suite 1700
Wilmington, DE 19801
Telephone: 302-384-9400
Facsimile: 302-384-9399

Dated: June 9, 2010

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are: eToys Direct 1, LLC (N/A); The Parent Company (7093); BabyUniverse, Inc. (7990); Dreamtime Baby, Inc. (8047); eToys Direct, Inc. (7296); PoshTots, Inc. (8660); eToys Direct 2, LLC (N/A); eToys Direct 3, LLC (N/A); Gift Acquisition, L.L.C. (0297); and My Twinn, Inc. (1842). The address for each of the Debtors is 717 17th Street, Suite 1300, Denver, CO 80202, with the exception of PoshTots, Inc., the address for which is 5500 Cox Road, Suite M, Glenn Allen, VA 23060.

# I.

# INTRODUCTION

The above-captioned debtors and debtor in possession (the "Debtors") together with the Official Committee of Unsecured Creditors (the "Committee") in the Debtors' cases have filed their proposed Joint Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Pursuant to Chapter 11 of the Bankruptcy Code, dated June 9, 2010 (the "Plan"), with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). A copy of the Plan is attached hereto as Exhibit A.[2] The Debtors and the Committee hereby submit this Disclosure Statement with Respect to Joint Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Pursuant to Chapter 11 of the Bankruptcy Code, dated June 9, 2010 (the "Disclosure Statement"), pursuant to Section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances or rejections of the Plan from certain holders of Claims against the Debtors.

Following a hearing held on June 8, 2010, the Disclosure Statement was approved by the Bankruptcy Court as containing "adequate information" in accordance with Section 1125 of the Bankruptcy Code. Pursuant to Section 1125(a)(1) of the Bankruptcy Code, "adequate information" is defined as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan." NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED, OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT. ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

APPROVAL OF THE DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT INDICATE THAT THE BANKRUPTCY COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN, NOR DOES SUCH APPROVAL CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT.

THE DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. EACH HOLDER OF A CLAIM OR INTEREST SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY. AFTER

---

[2] Capitalized terms used herein that are not otherwise defined herein shall have the meanings ascribed to them in the Plan.

CAREFULLY REVIEWING THESE DOCUMENTS, IF YOU ARE A CLAIM HOLDER ENTITLED TO VOTE, PLEASE INDICATE YOUR VOTE WITH RESPECT TO THE PLAN ON THE ENCLOSED BALLOT AND RETURN IT IN THE ENVELOPE PROVIDED.

A.    Disclosure Statement Enclosures

Accompanying this Disclosure Statement are copies of the following materials:

1.    The Plan (Exhibit A to the Disclosure Statement);

2.    A Notice (a) fixing the time for filing of acceptances or rejections of the Plan and objections to Confirmation of the Plan and (b) scheduling a hearing on Confirmation of the Plan (the "Notice");

3.    For Creditors entitled to vote, a ballot for acceptance or rejection of the Plan (the "Ballot"); and

4.    a liquidation analysis (Exhibit B to the Disclosure Statement).

B.    Only Impaired Classes Vote

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims and Interests that are "impaired" under the Plan may vote to accept or reject the Plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under the Plan on account of such claims or interests, such impaired class is deemed to have rejected the Plan and shall not be afforded an opportunity to vote to accept or reject the plan.

Under the Plan, Claims and Interests in Classes 1, 3, and 4 are impaired. Holders of Interests in Class 4 will receive no distribution, and, accordingly, such Interest Holders are deemed to reject the Plan, and their votes are not being solicited. Under the Plan, Claims in Classes 2 are Unimpaired and conclusively deemed to have accepted the Plan, and their votes are likewise not being solicited. ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 1 AND CLASS 3.

C.    Confirmation Hearing

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan for August 17, 2010, at 2:30 p.m. (ET) in the Bankruptcy Court, located at 824 N. Market Street, 6th Floor, Courtroom 1, Wilmington, DE 19801 (the "Confirmation Hearing"). The Bankruptcy Court has directed that objections, if any, to Confirmation of the Plan be served and filed on or before August 6, 2010, at 4:00 p.m. (ET) in the manner described in the Notice. The date of the Confirmation Hearing may be adjourned from time to time without further notice except for an in-court announcement at the Confirmation Hearing.

D.    Overview of the Plan

THE FOLLOWING IS A BRIEF SUMMARY OF THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. CREDITORS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW THE MORE DETAILED DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT AND THE PLAN ITSELF.

The Plan is a plan of liquidation, pursuant to which the net proceeds of the sale or other disposition of the Debtors' assets are being pooled and distributed, first to holders of Allowed Secured Claims, if any, as their interests may appear, then to the holders of Administrative and Priority Claims in accordance with the scheme of priorities set forth in the Bankruptcy Code, and thereafter to holders of General Unsecured Claims. Holders of Interests are not receiving any distribution under the Plan.

Under the Plan, Administrative Claims and Priority Tax Claims are unclassified and are to be paid in full, or upon such other terms as the Debtors and the affected Holders may agree. Class 1 Priority Claims are impaired and are to be paid in full or upon such other terms as the Debtors and the affected Holders may agree. Class 2 Secured Claims, if any, are Unimpaired, and at the option of the Debtors, either (i) the legal, equitable, and contractual rights to which such Claim entitles the Holder thereof shall be left unaltered, (ii) the Claim shall be left Unimpaired in the manner described in Section 1124(2) of the Bankruptcy Code, or (iii) the Holder of such Claim shall receive or retain the collateral securing such Claim. Class 3 General Unsecured Claims are impaired and each Holder of an Allowed Class 3 will receive its Pro Rata distribution of the liquidated assets of the estates after the payment or reserve for Administrative Claims, Priority Tax Claims, Priority Claims, Secured Claims, and Plan Expenses. Class 4 Interests are impaired and will not receive a distribution.

Set forth below is a table summarizing the classification and treatment of Claims and Interests under the Plan and the estimated distributions to be received by the holders of such Claims and Interests thereunder. The actual distributions may differ from those set forth in the table depending on the amount of Claims ultimately allowed in each category or Class and the amount of Cash ultimately available for distribution.

| DESCRIPTION/CLASS | ESTIMATED ALLOWED AMOUNT | ESTIMATED DISTRIBUTION (%) |
|---|---|---|
| Administrative Claims | $88,000.00[3] | 100% |
| Priority Tax Claims | $155,013.00 | 100% |
| Class 1 | $11,232.00 | 100% |
| Class 2 | $0.00 | 100% |
| Class 3 | $18,415,000.00 | <1% |
| Class 4 | N/A | 0.0% |

---

[3] This figure does not include fees and expenses of Professionals, which the Debtors estimate will total approximately $790,000.00 through confirmation.

# II.

## BACKGROUND; CHAPTER 11 CASES

A.    General Background and History

        The Debtors' history dates to 1997 and the incorporation of Everything But the
Baby Inc.  In 1999, the Debtors began marketing products under the BabyUniverse brand, and in
2001 the corporate name was changed to BabyUniverse, Inc.  In 2004, the Debtors purchased the
online assets of KB Toys, acquired the My Twinn doll company, and re-launched the My Twinn
website.  In 2006, the Debtors made an initial public offering of the stock of BabyUniverse, Inc.
and also acquired Dreamtime Baby.  In 2006, BabyUniverse, Inc. acquired PoshTots (and
introduced PoshLiving and PoshCravings), acquired ePregnancy.com, and launched
BabyTV.com.  In 2007, BabyUniverse, Inc. completed a merger with eToys Direct, Inc.  In
2008, BabyUniverse, Inc. changed its name to TPC, and a new subsidiary with the name
BabyUniverse, Inc. was incorporated.

        Prior to the Petition Date, The Parent Company ("TPC") was a leading commerce,
content, and new media company for growing families. TPC provided comprehensive
eCommerce and eContent resources to help families plan, play, and grow, including seven
eCommerce sites and three revenue generating eContent sites.  TPC's toy business offered
thousands of toys and children's products through its eToys.com and KBtoys.com web sites,
catalogs, and strategic retail partnerships.  Through its My Twinn brand, TPC marketed
personalized dolls—custom-built according to specifications, including hair color and style, eye
color, skin tone, and face shape to resemble a customer's child—and related accessories.
Through its baby business, TPC was a leading online retailer of brand-name baby, toddler, and
maternity products sold through the BabyUniverse.com and DreamtimeBaby.com web sites.
TPC's luxury brands, PoshTots.com and PoshLiving.com, reached the country's most affluent
consumers with luxury baby apparel and furnishings. With its eContent sites, BabyTV.com,
PoshCravings.com and ePregnancy.com, TPC established a recognized platform for the delivery
of content and new media resources to a national audience of expectant parents.  Collectively,
the Debtors received over 59 million annual web-site visits and sold to approximately 5.9 million
unique customers.  Through their various eCommerce venues, the Debtors' businesses offered
over 35,000 products from more than 500 manufacturers. TPC was publicly traded on the
NASDAQ under the ticker symbol KIDS.

        TPC is the direct or indirect 100% shareholder of each of the Debtors.  TPC is the
direct 100% shareholder of debtors BabyUniverse, Inc.; Dreamtime Baby, Inc.; eToys Direct,
Inc.; and PoshTots, Inc.  Etoys Direct, Inc. in turn is the 100% shareholder of eToys Direct 1,
LLC; eToys Direct 2, LLC; eToys Direct 3, LLC; Gift Acquisition, L.L.C.; and MyTwinn, Inc.
The majority of TPC's common stock is owned by D.E. Shaw Laminar Acquisition Holdings 3,
L.L.C.

        The Debtors' headquarters and corporate offices were located in Denver,
Colorado.  The Debtors also leased office space in Glen Allen, Virginia, with respect to PoshTots

and maintained a merchant buyers' office in Pittsfield, Massachusetts. The Debtors leased two distribution and fulfillment centers, one in Blairs, Virginia, which held inventory and shipped product directly to customers and one in Ringgold, Virginia, which was used primarily for ship-alone items and off-site storage.

As of December 1, 2008, the Debtors employed approximately 946 people, including 742 temporary seasonal warehouse and customer service workers. On December 15, 2008, the Debtors commenced a reduction in force; on December 23, 2008, the Debtors further reduced their employment. As of the Petition Date, the Debtors employed approximately ninety full-time employees in salaried and administrative positions, including customer service, and four independent contractors (collectively, the "Employees"). None of the Employees is represented by a union or other labor organization.

For fiscal year 2006, the Debtors' net sales were approximately $116 million and for fiscal year 2007 they were approximately $106 million. Net sales for the first half of 2008 were approximately $20 million. For fiscal year 2006, the Debtors' EBITDA reflected a loss of approximately $4 million, EBITDA for fiscal year 2007 reflected a loss of approximately $10.5 million, and EBITDA for the first half of fiscal 2008 reflected a loss of approximately $11 million.

B.    Debt

Until shortly before the Petition Date, the Debtors' principal secured indebtedness consisted of: (a) $25 million revolving credit facility with The CIT Group/Business Credit, Inc. ("CIT"), pursuant to an October 2007 credit facility (the "CIT Credit Facility"), secured by principally all of the Debtors' assets; and (b) a $25 million subordinated senior secured (second lien) term note with Laminar Direct Capital, L.L.C. ("Laminar Direct"), an affiliate of the D.E. Shaw Laminar Acquisition Holdings 3, L.L.C., the majority stock holder of TPC, of which $10 million has been funded, secured by a second lien on principally all of the Debtors' assets (the "Term Loan") and due December 27, 2010. The Term Loan is also the subject of a guarantee by John C. Textor, a member of TPC's board of directors.

In February 2008, the CIT Credit Facility was amended to provide, *inter alia*, for a limited guaranty of $15 million of the Debtors' obligations by D.E. Shaw Laminar Lending, Inc. ("Laminar Lending"), an affiliate of the D.E. Shaw Laminar Acquisition Holdings 3, L.L.C, the majority stock holder of TPC. In connection therewith, Laminar Lending deposited $15 million with HSBC Bank USA, National Association, which amount was pledged to CIT and in which CIT was granted a lien and security interest.

On or about December 12, 2008, the Debtors, Laminar Lending, and CIT entered into an Assignment and Acceptance Agreement (the "Assignment Agreement") pursuant to which Laminar Lending acquired all outstanding indebtedness under the CIT Credit Facility. In connection therewith, Laminar Lending became the administrative agent and collateral agent under the CIT Credit Facility and succeeded to CIT's rights thereunder, and the guaranty by Laminar Lending to CIT was terminated.

Consequently, on the Petition Date, the Debtors' principal indebtedness consisted of (a) the CIT Credit Facility, in principal amount of $8,641,236, as to which Laminar Lending was the administrative and collateral agent, and (b) the Term Loan, in principal amount of $10 million. In addition, as of the Petition Date, the Debtors estimated that they owed approximately $15,772,000 in accounts payable (which figure includes both invoices vouched for payment and an amount for invoices not yet received or processed for payment), the largest single portion of which is owed for delivery services. In total, the Debtors estimated the book value of their consolidated assets to be approximately $20,633,447, and the book value of their consolidated liabilities to be approximately $35,722,280.

## C.   Events Leading to Bankruptcy

Compared to prior years, TPC has been impacted by a sharp drop in sales due to reduced consumer recessionary spending and lower TPC inventory selection as a result of the TPC's tight liquidity position and reduced terms from its vendors. In addition, after significant current and prior year losses, a lack of supporting collateral and poor capital market conditions, TPC's ability to raise new capital to restructure its operations is limited.

The Debtors' restructuring efforts commenced in the beginning of 2008. The Debtors initially retained Gibson & Rechan, LLC ("G&R"), from July 10, 2008, to July 31, 2008, so that David Gibson could assess the Debtors' business, financial condition, liquidity position, and long-term prospects. On August 21, 2008, Mr. Gibson was engaged (on a half-time basis) to review and assess liquidity, assist with development of a reporting package, and to review and assess cost reductions and working capital. In October 2008, the Debtors retained Oppenheimer & Co. Inc. as financial advisors and investment bankers to assist in a search for one or more purchasers for the Debtors' assets. In December 2008, the Debtors retained Clear Thinking Group LLC as financial advisors to actively lead the financial management of these Chapter 11 cases and perform related duties on behalf of the Debtors. On December 15, 2008, the Debtors amended the G&R retention to engage Mr. Gibson full-time and to revise the work scope to include the following tasks: review and assess the Debtors' liquidity position, assist with lender negotiations, and assist with bankruptcy planning. On December 24, 2008, the Debtors further revised the retention to engage Mr. Gibson as chief restructuring officer (the "CRO").

On December 1, 2008, the Debtors' exposure under the CIT Credit Facility exceeded the borrowing base resulting in an overadvance and CIT's demand for immediate payment of the overadvance. The Debtors were unable to immediately repay the overadvance, and, thereafter, the Debtors and CIT entered into a letter agreement to permit further borrowings. Thereafter, the Debtors, CIT, and Laminar Lending entered into the Assignment Agreement as described above, terminating CIT's role as a lender.

In December 2008, faced with the exhaustion of availability under the CIT Credit Agreement, declining sales, and limited prospects for additional financing, the Debtors commenced the reduction in force described above. Thereafter, the Debtors and D. E. Shaw Laminar Lending 3 (C), L.L.C., as Agent, and D. E. Shaw Laminar Portfolios L.L.C., as Lenders, reached an agreement to provide funding for the Debtors through a sale process.

Consequently, the Debtors commenced the Chapter 11 Cases to avail themselves of the provisions of the Bankruptcy Code and preserve the status quo of their businesses through their cases while seeking sale by auction of substantially all of their assets.

D.  Commencement of Chapter 11 Cases

On December 28, 2008 (the "Petition Date"), each of the Debtors filed a petition under Chapter 11 of the Bankruptcy Code and continued in the management and possession of its businesses and properties as a debtor in possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner was appointed.

E.  Retention of Key Professionals/Appointment of Committee

a.  Retention of Bankruptcy Counsel

By Order of the Bankruptcy Court, the Debtors retained Pachulski Stang Ziehl & Jones LLP to serve as bankruptcy counsel in the Chapter 11 Cases.

b.  Retention of CRO, Financial Advisors, Investment Bankers, and Claims Agent

By various Orders of the Bankruptcy Court, (a) David Gibson was retained by the Debtors as their CRO and G&R was retained to assist him, (b) Clear Thinking Group, LLC, was retained by the Debtors as their financial advisor, (c) Oppenheimer & Co, Inc., was retained by the Debtors as their financial advisor and investment banker, and (d) Omni Management Group, LLC, was retained by the Debtors as their claims, noticing, and balloting agent.

c.  Appointment of Official Committee of Unsecured Creditors
    and Retention of Advisors

On July 8, 2009, the Office of the United States Trustee appointed the Committee. The members of the Committee are United Parcel Service; Quad/Graphics, Inc.; Zheijang Xinyun Wood Industry Group; The Step2 Company LLC; MADD International, Ltd.; National Products, Ltd.; and Chicco USA, Inc.

By Orders of the Bankruptcy Court, Arent Fox LLP and Elliott Greenleaf were retained as bankruptcy counsel to the Committee, and CBIZ Accounting, Tax & Advisory of New York, LLC and CBIZ, Inc., were retained as financial advisors to the Committee.

F.  First-Day Motions and Related Relief

On the Petition Date, the Debtors filed certain motions seeking emergency relief to allow their efficient and effective continued operations in the Chapter 11 Cases. On December 30, 2008, the Bankruptcy Court, *inter alia*, entered orders (i) authorizing the joint administration of the Debtors' Chapter 11 Cases for procedural purposes only, (ii) permitting the Debtors' continued use of their existing cash management system, (iii) permitting the Debtors to pay prepetition shipping and freight charges up to an aggregate total of $5,000, (iv) permitting

the Debtors to continue to honor certain prepetition customer programs, including with respect to gift cards, returns, price matching, coupons, contests, and appeasement programs, (v) permitting the Debtors to pay prepetition sales and use taxes up to an aggregate total of $30,000, (vi) permitting the Debtors to pay certain prepetition wages and benefits to their employees up to an aggregate total of $30,750, and (vii) establishing procedures for providing adequate assurance of future performance to the Debtors' utility providers.

In addition, on December 30, 2008, the Bankruptcy Court entered an order authorizing, on an interim basis (the "Interim DIP Order"), the Debtors to enter into a debtor-in-possession financing agreement (the "DIP") with D. E. Shaw Laminar Lending 3 (C), L.L.C., as Agent, and D. E. Shaw Laminar Portfolios L.L.C., as Lenders (collectively, the "Lenders"). Pursuant to the Interim DIP Order and the associated DIP Credit Agreement, and in accordance with the terms and conditions thereof, the Debtors were authorized, on an interim basis, to obtain post-petition loans up to the amount of $3,531,000 (the "Interim Facility"). The Interim Facility was calculated to provide the Debtors with the liquidity necessary to pursue their Chapter 11 Cases and effectuate a sale of assets.

G.    Schedules of Assets and Liabilities and Statements of Financial Affairs

On January 14, 2009, and January 15, 2009, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs with the Bankruptcy Court, which set forth, *inter alia*, scheduled prepetition claims against the Debtors based on their books and records.

H.    Liquidation Process and Asset Sales

Both before and after the Petition Date, the Debtors engaged in an intensive effort to identify and attract entities interested in purchasing the Debtors' business or its assets. In order to maximize the value of their assets, on January 2, 2009, the Debtors filed the Debtors' Motion Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for Orders (A) Approving Sale Procedures and Bid Protections, Including Break-Up Fees, in Connection With Sale of Substantially All Assets; (B) Scheduling an Auction for and Hearing to Approve One or More Sales; (C) Approving Notice of Respective Date, Time and Place for Auction and for Hearing on Approval of Sale(s); (D) Authorizing the Debtors (X) to Sell Substantially All Assets, Free and Clear of Liens, Claims, and Encumbrances and to Conduct Sales at the Debtors' Headquarters and Warehouse Locations and (Y) to Assume and Assign Executory Contracts and Unexpired Leases of Nonresidential Real Property; (E) Establishing Procedures in Connection with the Rejection of Executory Contracts and Unexpired Leases of Nonresidential Real Property; and (F) Granting Other Related Relief (the "Sale and Sale Procedures Motion"). The Sale and Sale Procedures Motion sought authority to conduct one or more auction (the "Auction") of the Debtors' business operations and related properties and assets, including the Debtors' intellectual property and internet domain names.

On January 16, 2009, in connection with the relief requested by the Sale and Sale Procedures Motion, the Court entered the Order (A) Approving Sale Procedures and Bid Protections, Including Break-Up Fee(s), in Connection with Sale of Substantially All Assets; (B) Scheduling an Auction for and Hearing to Approve One or More Sales; (C) Approving Notice of Respective Date, Time and Place for Auction and for Hearing on Approval of Sale(s) (the "Sale

Procedures Order," Docket No. 143). The Sale Procedures Order approved certain bid procedures (the "Bid Procedures") and fixed certain deadlines, including a bid deadline of February 2, 2009, at 5:00 p.m. (EST), an auction date of February 4, 2009, at 10:00 a.m. (EST), and a sale hearing date of February 6, 2009, at 9:00 a.m. (EST).

The Debtors received multiple bids with respect to the assets and subsets of the assets, many of which overlapped in whole or in part with other bids. Consequently, at the auction on February 4, 2009, the Debtors divided their assets among multiple lots and solicited bids on those lots, individually and in combination with certain other lots. At the conclusion of the auction, the Debtors, in consultation with the Debtors' pre-petition and post-petition lenders (the "Lenders") and the Committee, identified provisional prevailing bidders with respect to substantially all of their assets as distributed over sixteen lots.

At the sale hearing on February 6, 2009, the Debtors sought approval of the sale of the assets in Lot 1 (substantially all the assets of Debtor PoshTots, Inc.) to Posh Ventures, LLC, which relief was granted, and reported that they would continue to move forward with prevailing bidders and expected to seek approval of such sales at a future hearing date. On February 11, 2009, the Bankruptcy Court held a continued sale hearing, at which the sales of all other assets, other than the domain name toys.com and related assets (the "Toys.com Assets"), were approved.

Subsequent to the February 4, 2009, auction, the Debtors received additional inquiries from bidders interested in the Toys.com Assets, including satisfactory asset purchase agreement forms and superior bids, that led them to believe that the auction of the Toys.com Assets should be re-opened to maximize recoveries to these estates. The auction with respect to the Toys.com Assets was re-opened, conducted on February 27, 2009, and resulted in a substantially higher sale price for the Toys.com Assets. The sale of the Toys.com Assets was approved by the Bankruptcy Court on March 4, 2009. In aggregate, the Debtors' obtained approximately $9,056,000 in connection with the sales of their assets.

I       Claims Bar Date

On April 9, 2009, the Bankruptcy Court entered an order fixing (i) June 15, 2009, as the last day by which creditors were permitted to file proofs of claim with respect to claims against the Debtors arising prior to the Petition Date, (ii) June 26, 2009, as the last date by which governmental units were permitted to file proofs of claim with respect to claims against the Debtors arising prior to the Petition Date, and (iii) June 26, 2009, at the last date by which all parties were permitted to assert any administrative claim arising between the Petition Date and May 15, 2009.

J.      Settlement with the Lenders

The final hearing with respect to the DIP was continued from time to time pursuant to stipulations among the Debtors, Lenders, and the Committee. Notwithstanding efforts among the Debtors, the Lenders, and the Committee to resolve certain objections asserted by the Committee, no resolution could be reached, and on February 20, 2009, the Debtors

received from the Lenders written notice of the Interim Facility Maturity Date, demand for repayment, and of the triggering of the Carve-Out (as defined in the Interim DIP Order). Faced with insufficient unencumbered assets to continue the administration of the Chapter 11 Case, on February 23, 2009, the Debtors filed the Debtors' Motion to Convert Cases from Chapter 11 to Chapter 7 of the Bankruptcy Code (the "Conversion Motion"). On February 24, 2009, the Committee filed the Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Leave, Standing and Authority to Prosecute Causes of Action on Behalf of the Debtors' Estates (the "Standing Motion").

Negotiations among the Debtors, the Lenders, and the Committee continued. On or about March 10, 2009, the Debtors, the Lenders, the Committee, and the other parties identified on the Settlement Agreement With Mutual Release (the "Agreement") entered into the Agreement, which Agreement resolved the Conversion Motion and the Standing Motion, allowed the Chapter 11 Cases to remain in Chapter 11, supplied liquidity for administration and other expenses, and, upon the effective date of the Agreement, completely resolved all claims of the Lenders in the Chapter 11 Cases. On that same date, the Debtors filed a motion seeking approval of the Agreement, and the Bankruptcy Court entered an order approving the Agreement on March 18, 2009.

K.     Avoidance Actions

Under sections 547, 548, and 550 of the Bankruptcy Code, a debtor may seek to avoid and recover certain pre-petition payments made by the debtor to or for the benefit of a creditor, in the ninety days prior to the petition date, in respect of an antecedent debt if such transfer was made when the debtor was insolvent; transfers made to a creditor that was an "insider" of the debtor are subject to these provisions if the payment was made within one year of the debtor's filing of a petition under Chapter 11 (collectively, the "Avoidance Actions").

By agreement of the Debtors and the Committee approved by the Bankruptcy Court on June 5, 2009, the Debtors' right to pursue certain Avoidance Actions, other than any such actions against members of the Committee or their affiliates, was assigned to the Committee. Thereafter, the Bankruptcy Court entered an order establishing certain settlement procedures with respect to Avoidance Actions, and the Committee retained Receivables Management Services Corporation to assist it with pursuit and litigation of the Preference Actions. Upon the Effective Date, all Avoidances Actions, together with other Litigation, shall vest in the Post-Confirmation Debtors.

III.

**SUMMARY OF THE PLAN**

A.     General

The Plan is a plan of liquidation that contemplates the distribution of the remaining net proceeds realized from the earlier complete liquidation of the assets of the Debtors. As a result of the Debtors' asset disposition efforts, the Debtors presently have

approximately $503,000 in cash and, after other collections and satisfaction of claims of higher priority, expect to have less than $50,000 available for distribution to Class 3 General Unsecured Claims under the Plan.

Under the Plan, available proceeds will be distributed first to satisfy the Allowed Administrative Claims, Priority Tax Claims, Class 1 Priority Claims, and Class 2 Secured Claims in accordance with the scheme of priorities under the Bankruptcy Code. After payment in full of such Claims and Plan Expenses, the net cash available shall be paid Pro Rata to satisfy the Class 3 General Unsecured Claims. Class 4 Equity Interests shall receive no distribution under the Plan. For ease of reference, the Debtors have appended a liquidation analysis to this Disclosure Statement as Exhibit B which shows the amounts expected to be available for distribution as well as the amounts projected to be distributed to each class of Creditors under the Plan.

B.     Classification and Treatment of Claims and Interests

1. Unclassified Claims.

The Bankruptcy Code does not require administrative and certain priority claims to be classified under a Chapter 11 plan. Accordingly, Administrative Claims and Priority Tax Claims are not classified in the Plan.

The Plan provides for the payment of Allowed Administrative Claims in full, without post-petition interest or penalties, in Cash, as soon as practicable after the later of the Effective Date and the date on which each such Claim becomes an Allowed Claim. The Plan provides for payment of Allowed Priority Tax Claims either (a) in full, without post-petition interest or penalties, in Cash, as soon as practicable after the later of the Effective Date and the date on which each such Claim becomes an Allowed Claim or (b) in such lesser amount as the Holder of an Allowed Priority Tax Claim and the Debtors might otherwise agree.

Administrative Claims include any actual and necessary costs and expenses of preserving the estate, any actual and necessary expenses of operating and liquidating the business of the Debtors after the Petition Date, and any indebtedness or obligations incurred by the Debtors as debtors in possession in connection with the conduct of the business of the debtor in possession. Ordinary course post-petition liabilities shall be paid pursuant to their terms. Compensation or reimbursement of expenses to Professionals retained by the Debtors or the Committee (as approved by the Bankruptcy Court) will be paid to the extent allowed as an Allowed Administrative Claim by the Bankruptcy Court. The Debtors estimate that the total amount of unpaid Allowed Administrative Claims as of the Effective Date will be approximately $88,000.00, excluding the fees and expenses of Professionals, which the Debtors estimate total approximately $790,000.00 through Confirmation and which have been satisfied in part through interim fee applications.

Priority Tax Claims consist of any Claims for taxes, interest and penalties against the Debtors entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code. The Debtors

estimate that the total amount of Allowed Priority Tax Claims will be approximately $155,000.00.

2. Classification and Treatment of Claims and Interests.

The Plan classifies and treats other Claims and Interests as follows:

Class 1 Claims - Priority Claims. Class 1 Claims are impaired. Class 1 consists of all Claims other than Administrative Claims and Priority Tax Claims entitled to priority in payment under Section 507(a) of the Bankruptcy Code. Each Holder of an Allowed Class 1 Claim shall receive either (a) payment in full in Cash as soon as practicable after the later of (i) the Effective Date, and (ii) the date on which such Claim becomes an Allowed Claim or (b) as otherwise agreed by the Holder of such Allowed Class 1 Claim. The Debtor anticipates that only approximately $11,232.00 of Priority Claims will be Allowed Claims.

Class 2 Claims - Secured Claims. Class 2 Claims may be Impaired. Class 2 consists of all remaining Secured Claims. The Debtors believe that all valid Secured Claims were paid in full or otherwise released or satisfied during the course of the Chapter 11 Cases and that there are no valid Allowed Claims in this class. To the extent there are any Claims in this class, each such Claim shall be deemed to be a separate subclass. To the extent there are any Allowed Class 2 Claims, at the option of the Debtors, either (i) the legal, equitable, and contractual rights to which such Claim entitles the Holder thereof shall be left unaltered, (ii) the Claim shall be left Unimpaired in the manner described in Section 1124(2) of the Bankruptcy Code, or (iii) the Holder of such Claim shall receive or retain the collateral securing such Claim. The Holders of Claims in this Class, if any, are not entitled to vote. The Debtors anticipate that no Secured Claims will be Allowed Claims

Class 3 Claims - General Unsecured Claims. Class 3 General Unsecured Claims are impaired. Class 3 consists of all unsecured Claims not included in any other class. Each holder of an Allowed Class 3 Claim shall receive in respect of such Claim its Pro Rata distribution of the liquidated assets of the estates after the payment or reserve for Administrative Claims, Priority Tax Claims, Priority Claims, Secured Claims, and Plan Expenses. The holders of Claims in this Class are entitled to vote.

Approximately $160,000,000.00 of General Unsecured Claims have been filed against the Debtors' estates or scheduled by the Debtors. The Debtors estimate that approximately $18.5 million in unsecured claims will ultimately be Allowed Class 3 Claims. The Debtors anticipate that Allowed Class 3 Claims will receive a distribution of less than 1% on account of their Allowed Claims.

Class 4 - Interests. Class 4 Interests are impaired. Class 4 Interests consist of all equity ownership interests in any of the Debtors. On the Effective Date, all Interests will be deemed canceled, null and void and of no force and effect. Under the Plan, the Interest holders will receive no distribution and are deemed to reject the Plan.

C.    Means for Implementation of the Plan; Distributions

1.    Corporate Action.

On the Effective Date and automatically and without further action, (i) each existing member of the Board of Directors of the Debtors will resign or be terminated by the Plan Administrator and (ii) the Plan Administrator shall be deemed the sole shareholder, officer, and director of the Post-Confirmation Debtors. The Plan will be administered by the Plan Administrator, and all actions taken thereunder in the name of the Post-Confirmation Debtors shall be taken through the Plan Administrator.

2.    Plan Administrator.

On the Effective Date, the Plan Administrator shall begin acting for the Post-Confirmation Debtors in the same fiduciary capacity as applicable to a board of directors, subject to the provisions hereof. The Plan Administrator shall be compensated at the rate of $450 per hour and may be paid without further order of the Bankruptcy Court. The Plan Administrator shall be entitled to reimbursement for his actual, reasonable, and necessary expenses incurred in connection with the performance of his duties, without the need for further Bankruptcy Court approval. The Plan Administrator shall not be liable for any action he takes or omits to take that he believes in good faith to be authorized or within his rights or powers, absent gross negligence or willful misconduct on his/her part. All distributions to be made to Creditors under the Plan shall be made by the Plan Administrator, who shall deposit and hold all Cash in trust for the benefit of Creditors (including Professionals) receiving distributions under the Plan

3.    Rights of Action.

On the Effective Date, any right, claim or cause of action, belonging to the Debtors or their estates or to the Committee against any Person or Entity, including without limitation, any Litigation, and including specifically preference actions that, by agreement of the Debtors and the Committee approved by the Bankruptcy Court on June 5, 2009, were previously assigned to the Committee shall be vested in and retained by the Post-Confirmation Debtors. The Plan Administrator shall pursue, settle, or release all reserved Litigation, as appropriate, in accordance with the best interest of and for the benefit of the Creditors entitled to receive distributions under the Plan.

4.    Distributions Under the Plan.

(a)    Payment on Account of Allowed Claim.  Unless expressly provided otherwise, all Plan distributions shall be made by the Plan Administrator to the holder of each Allowed Claim as set forth in the claims register maintained by the Debtors' claims agent. Payments of Cash made by the Plan Administrator (or an agent thereof) pursuant to the Plan will be in U.S. Dollars by check or by wire transfer. Nothing set forth in the Plan will be deemed a waiver of the Debtor's statutory or common law setoff rights. If any distribution remains unclaimed for a period of sixty (60) days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder entitled thereto, such unclaimed property

shall be forfeited by such Holder whereupon all right, title and interest in and to the unclaimed property shall be held in reserve by the Plan Administrator to be distributed to other Creditors in accordance with this Plan. Any distribution that remains unclaimed for a period of sixty (60) days after the Plan Administrator's making of the final distribution under the Plan shall, after satisfaction of any accrued but unpaid Plan Expenses, be contributed by the Post-Confirmation Debtor to a charitable organization to be selected by the Plan Administrator.

(b)     Reserve for Plan Expenses. Prior to making any distributions, the Plan Administrator shall set aside, deduct and reserve an amount of Cash equal to the estimated amount of Plan Expenses. Any Cash in such Plan Expense reserve that the Plan Administrator deems to be excess prior to the closing of the Chapter 11 Case shall be distributed to Holders of Allowed Claims and Interests pursuant to Article 4 of the Plan.

Plan Expenses shall mean all actual and necessary costs and expenses to be incurred after the Effective Date in connection with the administration of the Plan at the direction of the Plan Administrator, including the fees and expenses of the Plan Administrator and any professionals retained by the Plan Administrator, the reasonable fees and expenses of legal counsel engaged under Article 5 of the Plan. The Plan Administrator shall be compensated at the rate of $450 per hour and may be paid without further order of the Bankruptcy Court. The Plan Administrator shall be entitled to reimbursement for his actual, reasonable, and necessary expenses incurred in connection with the performance of his duties, without the need for further Bankruptcy Court approval. The amount of funds to be reserved to cover Plan Expenses will be determined just prior to the Effective Date. The Debtors presently estimate that the sum of $230,000.00 will be reserved from existing distributable assets to cover Plan Expenses.

(c)     Disputed Claim Reserves.     On and after the Effective Date, the Plan Administrator shall establish and maintain reserves for all Disputed Claims. For purposes of establishing a reserve, Cash will be set aside equal to the amount that would have been distributed to the Holders of Disputed Claims in such Class had their Disputed Claims been deemed Allowed Claims on the Effective Date or such other amount as may be approved by the Bankruptcy Court upon motion of the Plan Administrator. If, when, and to the extent any such Disputed Claim becomes an Allowed Claim by Final Order or by settlement by the Plan Administrator, the relevant portion of the Cash held in reserve therefor shall be distributed by the Plan Administrator to the Creditor. The balance of such Cash, if any, remaining after all Disputed Claims have been resolved, shall be distributed Pro Rata to all Holders of Allowed Claims in accordance with Article 4 of the Plan. No payments or distributions shall be made with respect to a Claim which is a Disputed Claim pending the resolution of the dispute by settlement or Final Order.

D.     Unexpired Leases and Executory Contracts

Any and all pre-petition leases or executory contracts not previously rejected by the Debtors, unless specifically assumed pursuant to order(s) of the Bankruptcy Court prior to the Confirmation Date or the subject of a motion to assume or assume and assign pending on the Confirmation Date, shall be deemed rejected by the Debtors on the Confirmation Date.

Proofs of claim for rejection damages for any lease or executory contract rejected pursuant to the Plan shall, unless another order of the Bankruptcy Court provides for an earlier date, be filed with the Bankruptcy Court and served in accordance with procedures set forth in the Confirmation Order within thirty (30) days after the mailing of notice of the entry of the Confirmation Order.

E.      Retention of Jurisdiction

Following the Confirmation Date and until such time as all payments and distributions required to be made and all other obligations required to be performed under the Plan have been made and performed by the Plan Administrator, the Bankruptcy Court shall retain jurisdiction as is legally permissible, including, without limitation, for the purposes described in Article 9 of the Plan.

F.      Conditions to Effectiveness

The conditions to the confirmation and effectiveness of the Plan are set forth in Article 8 of the Plan. In the event that the condition specified in Section 8.1(b) of the Plan has not occurred or been waived on or before ninety (90) days after the Confirmation Date, the Confirmation Order may be vacated upon order of the Court after motion made by the Debtors or any party in interest.

G.      Substantive Consolidation  The Plan serves as a motion seeking entry of an order substantively consolidating the Chapter 11 Cases for distribution and voting purposes. Unless an objection to substantive consolidation is made in writing by any Creditor affected by the Plan on or before the Plan Objection Deadline, an order substantively consolidating these Chapter 11 Cases for distribution and voting purposes may be entered by the Bankruptcy Court, which order may be the Confirmation Order. In the event any such objections are timely filed, a hearing with respect thereto shall be scheduled by the Bankruptcy Court, which hearing may, but need not, coincide with the Confirmation Hearing. In effectuation of such substantive consolidation, on the Effective Date: (a) no Distributions will be made under the Plan on account of the Intercompany Claims; (b) the guarantees of the Debtors will be deemed eliminated so that any Claim against the Debtors and any guarantee thereof executed by any Debtor and any joint and several liability of the Debtors with one another will be deemed to be one obligation of these Debtors; (c) each and every Claim against the Debtors will be deemed asserted as a single Claim against the Debtors as a whole, and will be treated in the same Class regardless of the Debtor; and (d) all distributions on account of Allowed Claims will be made from The Parent Company. Additionally, notwithstanding the substantive consolidation herein, substantive consolidation shall not affect the obligation of each and every one of the Debtors under 28 U.S.C. § 1930(a)(6) until a particular case is closed, converted, or dismissed.

H.      Modification or Revocation of the Plan

The Debtors reserve the right, in accordance with the Bankruptcy Code, to amend or modify the Plan at or any time prior to the Confirmation Date, as provided in Section 1127 of the Bankruptcy Code or as provided in Bankruptcy Rule 3019. If the Plan, as altered, amended or

modified, is not consummated on or before the Effective Date or such other date as the Bankruptcy Court fixes, all holders of Claims and Interests shall be returned to the *status quo ante*, as if the Plan had not been filed, and the Confirmation Order shall be deemed vacated *ab initio*.

The Plan Administrator and/or Post-Confirmation Debtors may, with the approval of the Bankruptcy Court and without notice to all holders of Claims and Interests, insofar as it does not materially and adversely affect the interest of holders of Claims, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of this Plan.

I.    Miscellaneous

1.    Committee. Upon the occurrence of the Effective Date, the Committee shall be dissolved, and each individual member and any retained Professional shall be discharged from any further activities in the Chapter 11 Cases. The professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for services rendered or expenses incurred after the Effective Date, except for reasonable fees for (i) services rendered, and actual and necessary expenses incurred, in connection with any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed and served after the Effective Date for services provided prior to the Effective Date or (ii) services rendered, and actual and necessary expenses incurred, in connection the selection of any successor Plan Administrator pursuant to Section 5.3 of the Plan.

2.    Exculpation. **Except as otherwise provided by the Plan or the Confirmation Order or other Final order of the Bankruptcy Court, on the Effective Date, the Debtors, certain of the Debtors' officers and directors expressly limited to Charles Goodrich, Philip Manoff and Michael Miyaki, the Committee and its individual members, the Plan Administrator, and their respective bankruptcy professionals including attorneys and financial advisors, and their successors and assigns, shall be deemed released by each of them against the other of and from any claims, obligations, rights, causes of action and liabilities for any act or omission in connection with, or arising out of, the Chapter 11 Cases, including, without limiting the generality of the foregoing, all sales of assets, the Disclosure Statement, the pursuit of approval of the Disclosure Statement, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions that constitute willful misconduct, gross negligence or fraud, and all such Persons, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy Code.**

3.    Injunction. **Except as otherwise provided in the Plan, on and after the Confirmation Date, all Entities who have held, hold or may hold Claims against the Debtors or Interests in the Debtors are, with respect to any such Claims or Interests, permanently enjoined from and after the Confirmation Date from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial,**

arbitral, administrative or other forum) against or affecting the Debtors' Estates, the Post-Confirmation Debtors, any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Entities, including without limitation the Plan Administrator, or any property of any such transferee or successor; (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means whether directly or indirectly, of any judgment, award, decree or order against the Debtors' Estates, the Post-Confirmation Debtors, any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to any of the foregoing Entities, including without limitation the Plan Administrator; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors' Estates, the Post-Confirmation Debtors, any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to any of the foregoing Entities, including without limitation the Plan Administrator; (d) asserting any right of setoff, of any kind, directly or indirectly, against any obligation due the Debtors' Estates, the Post-Confirmation Debtors, any of their property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Entities, including without limitation the Plan Administrator; and (e) taking any actions in any place and in any manner whatsoever that do not conform to or comply with the provisions of the Plan. *Provided, however,* that this section 10.7 shall not in any way limit Ernst & Young LLP's right to respond (including, without limitation, the right assert counterclaims or setoff) to Litigation or Claims initiated by or asserted by the Post-Confirmation Debtors, the Plan Administrator or any other party entitled to pursue the Debtors' Claims.

IV.

VOTING REQUIREMENTS; ACCEPTANCE
AND CONFIRMATION OF THE PLAN

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that (i) the Plan has classified Claims and Interests in a permissible manner, (ii) the Plan complies with applicable provisions of the Bankruptcy Code, (iii) the Debtors have complied with applicable provisions of the Bankruptcy Code, (iv) the Debtors have proposed the Plan in good faith and not by any means forbidden by law, (v) the disclosure required by Section 1125 of the Bankruptcy Code has been made, (vi) the Plan has been accepted by the requisite votes of creditors (except to the extent that cramdown is available under Section 1129(b) of the Bankruptcy Code), (vii) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, (viii) the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class by providing to such holders on account of their Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim or Interest in such Class has accepted the Plan, and (ix) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on Confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date.

A.   Parties in Interest Entitled to Vote

Pursuant to the Bankruptcy Code, only Classes of Claims and Interests that are
"impaired" (as defined in Section 1124 of the Bankruptcy Code) under the Plan are entitled to
vote to accept or reject the Plan.  A Class is impaired if the legal, equitable, or contractual rights
to which the Claims or Interests of that Class entitled the holders of such Claims or Interests are
modified, other than by curing defaults and reinstating the debt.  Classes of Claims and Interests
that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have
accepted the Plan.  In addition, Classes of Claims and Interests that receive no distributions
under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

B.   Classes Impaired Under the Plan

The following Classes of Claims and Interests are impaired under the Plan:

   Class 1:  Priority Claims
   Class 3:  General Unsecured Claims
   Class 4:  Interests

Acceptances of the Plan are being solicited only from those holders of Claims or Interests
in Impaired Classes that will or may receive a distribution under the Plan.  Accordingly, the
Debtors are soliciting acceptances from members of Class 1 Priority Claims and Class 3 General
Unsecured Claims.  Class 4 Interests are receiving no distribution under the Plan and are
therefore deemed to reject the Plan.

C.   Voting Procedures and Requirements

In voting for or against the Plan, please use only the Ballot or Ballots sent to you with
this Disclosure Statement.  If you are a member of Class 3 and did not receive a Ballot, if your
Ballot is damaged or lost, or if you have any questions concerning voting procedures, please call
Debtor's voting agent, Omni Management Group LLC, at (818) 906-8300.  PLEASE FOLLOW
THE DIRECTIONS CONTAINED ON THE ENCLOSED BALLOT CAREFULLY.

YOU SHOULD COMPLETE AND SIGN YOUR BALLOT AND RETURN IT IN THE
ENCLOSED ENVELOPE TO:

ETOYS DIRECT 1, LLC—BALLOT PROCESSING
C/O OMNI MANAGEMENT GROUP LLC
16161 VENTURA BLVD.
SUITE C, PMB 439
ENCINO, CA 91436-2522

68781-001\DOCS_DE:158033.5

VOTES CANNOT BE TRANSMITTED ORALLY. FACSIMILE BALLOTS WILL NOT BE ACCEPTED. TO BE COUNTED, ORIGINAL SIGNED BALLOTS MUST BE RECEIVED ON OR BEFORE AUGUST 6, 2010, AT 4:00 P.M., PREVAILING EASTERN TIME. IT IS OF THE UTMOST IMPORTANCE TO THE DEBTORS AND THE COMMITTEE THAT YOU VOTE PROMPTLY TO ACCEPT THE PLAN.

D.      Confirmation Without Acceptance of All Impaired Classes

The Bankruptcy Code contains provisions for confirmation of the Plan even if the Plan is not accepted by all Impaired Classes, as long as at least one Impaired Class of Claims has accepted it. These so-called "cramdown" provisions are set forth in Section 1129(b) of the Bankruptcy Code.

A plan may be confirmed under the cramdown provisions if, in addition to satisfying all other requirements of Section 1129(a) of the Bankruptcy Code, it (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan. As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have specific meanings unique to bankruptcy law.

AS CLASS 4 INTERESTS ARE DEEMED TO REJECT THE PLAN, THE DEBTORS INTEND TO SEEK CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE WITH RESPECT TO SUCH CLASS.

E.      Best Interests Test

In order to confirm the Plan, the Bankruptcy Court must independently determine that the Plan is in the best interests of each Holder of a Claim or Interest in any such impaired Class who has not voted to accept the Plan. Accordingly, if an impaired Class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such member would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on such date.

F.      Liquidation Analysis

In this case, the Debtors have liquidated substantially all of their assets other than Preference Actions, resulting in approximately $503,000.00 in net liquidation proceeds presently available to distribution to creditors holding priority, secured, and unsecured claims against the Debtors' estates. Based upon the Debtor's current projections, administrative, priority and secured claims would be paid in full under the Plan, while Holders of Class 3 General Unsecured Claims would receive a projected distribution of less than 1%.

20

If the Chapter 11 Cases were converted to Chapter 7 cases, the Debtors' estate would incur the costs of payment of a statutorily allowed commission to the Chapter 7 trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtors believe that such amounts would exceed the amount of Plan Expenses that will be incurred in implementing the Plan and winding up the affairs of the Debtors. Additionally, the Debtors' estates would suffer substantial additional delays, as a Chapter 7 trustee and his/her counsel took time to develop a necessary learning curve in order to complete the administration of the estates. The Debtors' estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for professionals) which will constitute Allowed Claims in any Chapter 7 cases.

Based upon these reasons, the Debtors believe that creditors will receive at least as much under the Plan and likely more, than they would receive if the Chapter 11 Cases were converted to Chapter 7 cases. Toward this end, the Debtors have appended hereto as Exhibit B their liquidation analysis that supports the Debtors' view that creditors will receive at least as much under the Plan and likely more, than they would receive if the Chapter 11 Cases were converted to Chapter 7 cases. A summary of Exhibit B appears in the table immediately below.

| Assets | Amount | Liabilities | Amount |
|---|---|---|---|
| Cash on hand | $602,037 | | |
| Due from sales partners (e.g., accounts receivable) | $160,617 (expected recovery) | | |
| Miscellaneous recoveries (including deposits and retainers) | $31,869 (expected recovery) | | |
| Collection on open avoidance actions (based on analysis by CBIZ Mahoney Cohen) | $590,000 (expected recovery) | | |
| Other causes of action | Unknown | | |
| **Total** | $1,384,523 | | |
| | | Estimated costs through confirmation | ($14,710) |
| | | Estimated Secured Claims | ($0) |
| | | Estimated administrative claims | ($882,362) |
| | | Estimated priority claims | ($166,245) |
| | | Estimated costs of administration under Plan | ($230,000) |
| **Total** | | | ($1,293,317) |
| **Available for Unsecured Creditors in Under Plan  $91,206** | | | |
| | | Estimated additional costs of liquidation and administration in Chapter 7 | ($200,000) |
| **Available for Unsecured Creditors Under Chapter 7 Liquidation  ($108,794)** | | | |

G.    Feasibility

Under Section 1129(a)(11) of the Bankruptcy Code, the Debtors must show that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). The Plan clearly complies with this requirement because all of the Debtors' remaining assets will be distributed to Creditors pursuant to the terms of the Plan and, provided the Plan is confirmed and consummated, the estates will no longer exist to be subject to future reorganization or liquidation. Furthermore, feasibility under Section 1129(a)(11) is supported by the liquidation analysis attached as Exhibit B and by the analysis in Article IV, Section F, of this Disclosure Statement, above.

H.    Compliance with the Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. The Debtors have considered each of these issues in the development of the Plan and believes that the Plan complies with all applicable provisions of the Bankruptcy Code.

V.

ALTERNATIVES TO CONFIRMATION
AND CONSUMMATION OF THE PLAN

The Debtors believe the Plan affords Holders of Claims the potential for the maximum distribution on account of their claims and, therefore, is in the best interests of such Holders. If the Plan is not confirmed, the only viable alternatives are dismissal of the Chapter 11 Cases or conversion to Chapter 7 of the Bankruptcy Code. For the reasons described herein, neither of these alternatives is preferable to confirmation and consummation of the Plan.

If the Chapter 11 Cases were dismissed, creditors would revert to a "race to the courthouse," the result being that creditors would not receive a fair and equitable distribution of the Debtors' remaining assets. As set forth above, the Debtors and the Committee believe this Plan provides a greater recovery to Creditors than would be achieved in Chapter 7 cases. Therefore, a Chapter 7 case is not an attractive or superior alternative to the Plan. Thus, the Plan represents the best available alternative for maximizing returns to creditors.

# VI.

## RISK FACTORS

**A.**   Allowed Claims May Exceed Estimates

The projected distributions set forth in this Disclosure Statement are based upon the Debtors' good faith estimate of the amount of Plan Expenses, as defined in the Plan, that will be incurred and total amount of Claims in each Class that will ultimately be Allowed. The actual amount of Plan Expenses could be greater than expected for a variety of reasons, including greater than anticipated administrative and litigation costs associated with resolving disputed claims. Additionally, the actual amount of Allowed Claims in any class could be greater than anticipated, which will impact the distributions to be made to holders of Claims.

**B.**   Plan May Not Be Accepted or Confirmed

While the Debtors believe the Plan is confirmable under the standards set forth in Section 1129 of the Bankruptcy Code, there can be no guarantee that the Bankruptcy Court will agree. Additionally, the Plan as drafted requires acceptance by Class 3 General Unsecured Claims. If Class 3 votes to reject the Plan, the Plan cannot be confirmed without modification.

**C.**   Recoveries Are Uncertain

The estimated amount of assets available for distribution to Holders of Allowed Class 3 Claims is contingent upon recovery upon the Litigation and, specifically, the Avoidance Actions.

## VII.

## CERTAIN FEDERAL INCOME
## TAX CONSEQUENCES OF THE PLAN

The following discussion addresses certain United States federal income tax consequences of the consummation of the Plan. This discussion is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), existing and proposed regulations thereunder, current administrative rulings, and judicial decisions as in effect on the date hereof, all of which are subject to change, possibly retroactively. No rulings or determinations by the Internal Revenue Service have been obtained or sought by the Debtors with respect to the Plan. An opinion of counsel has not been obtained with respect to the tax aspects of the Plan. This discussion does not purport to address the federal income tax consequences of the Plan to particular classes of taxpayers (such as foreign persons, S corporations, mutual funds, small business investment companies, regulated investment companies, broker-dealers, insurance companies, tax-exempt organizations and financial institutions) or the state, local, or foreign income and other tax consequences of the Plan. NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS

STRONGLY URGED TO CONSULT A TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

A.    Federal Income Tax Consequences to Holders of Claims and Interests

A Holder of an Allowed Claim or Interest will generally recognize ordinary income to the extent that the amount of Cash or property received (or to be received) under the Plan is attributable to interest that accrued on a Claim but was not previously paid by the Debtors or included in income by the Holder of the Allowed Claim or Interest. A Holder of an Allowed Claim or Interest will generally recognize gain or loss equal to the difference between the Holder's adjusted basis in its Claim and the amount realized by the Holder upon consummation of the Plan that is not attributable to accrued but unpaid interest. The amount realized will equal the sum of Cash and the fair market value of other consideration received (or to be received).

The character of any gain or loss that is recognized will depend upon a number of factors, including the status of the Creditor, the nature of the Claim or Interest in its hands, whether the Claim was purchased at a discount, whether and to what extent the Creditor has previously claimed a bad debt deduction with respect to the Claim, and the Creditor's holding period of the Claim or Interest. If the Claim or Interest in the Creditor's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the Creditor is a non-corporate taxpayer and held such Claim or Interest for longer than one year or short-term capital gain or loss if the Creditor held such Claim or Interest for less than one year.

A Holder of an Allowed Claim or Interest who receives, in respect of its Claim, an amount that is less than its tax basis in such Claim or Interest may be entitled to a bad debt deduction if either: (i) the Holder is a corporation; or (ii) the Claim or Interest constituted (a) a debt created or acquired (as the case may be) in connection with a trade or business of the holder or (b) a debt the loss from the worthlessness of which is incurred in the Holder's trade or business. A holder that has previously recognized a loss or deduction in respect of its Claim or Interest may be required to include in its gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the holder's adjusted basis in such Claim or Interest.

Holders of Claims or Interests who were not previously required to include any accrued but unpaid interest with respect to in their gross income on a Claim or Interest may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. Holders previously required to include in their gross income any accrued but unpaid interest on a Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

Holders of a Claim constituting any installment obligation for tax purposes may be required to currently recognize any gain remaining with respect to such obligation if, pursuant

to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold or otherwise disposed of within the meaning of section 453B of the Tax Code.

The Holders of Class 3 General Unsecured Claims are expected to receive only a partial distribution of their Allowed Claims and Class 4 Interests will not receive any distributions under the Plan on account of their Interests. Whether the Holder of such Claims or Interests will recognize a loss, a deduction for worthless securities or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the Holder and its Claims or Interests. Accordingly, the Holders of Class 3 Claims and Class 4 Interests should consult their own tax advisors.

B.      Federal Income Tax Consequences to the Debtors

Under the Tax Code, a taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("COD income") realized during the taxable year. Section 108 of the Tax Code provides an exception to this general rule, however, if the cancellation occurs in a case under the Bankruptcy Code but only if the taxpayer is under the jurisdiction of the bankruptcy court and the cancellation is granted by the court or is pursuant to a plan approved by the court.

Section 108 of the Tax Code requires the amount of COD income so excluded from gross income to be applied to reduce certain tax attributes of the taxpayer. The tax attributes that may be subject to reduction include the taxpayer's net operating losses and net operating loss carryovers (collectively, "NOLs"), certain tax credits and most tax credit carryovers, capital losses and capital loss carryovers, tax bases in assets, and foreign tax credit carryovers. Attribute reduction is calculated only after the tax for the year of the discharge has been determined. Section 108 of the Tax Code further provides that a taxpayer does not realize COD income from cancellation of indebtedness to the extent that payment of such indebtedness would have given rise to a deduction.

Under the Plan, holders of Claims are expected to receive less than full payment on their Claims. The Debtors' liability to the holders of Claims in excess of the amount satisfied by distributions under the Plan will be canceled and therefore, will result in COD income to the Debtors. The Debtors should not realize any COD income, however, to the extent that payment of such Claims would have given rise to a deduction to the Debtors had such amounts been paid. In addition, any COD income that the Debtors realize should be excluded from the Debtors' gross income pursuant to the bankruptcy exception to Section 108 of the Tax Code described in the immediately preceding paragraph.

The exclusion of COD income, however, will result in a reduction of certain tax attributes of the Debtors. Because attribute reduction is calculated only after the tax for the year of discharge has been determined, the COD income realized by the Debtors under the Plan should not diminish the NOLs and other tax attributes that may be available to offset any income and gains recognized by the Debtors in the taxable year that includes the Effective Date.

C.    Importance of Obtaining Professional Tax Assistance

The foregoing is intended to be only a summary of certain of the United States federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional.  Holders of Claims or Interests are strongly urged to consult with their own tax advisors regarding the federal, state, local and foreign income and other tax consequences of the Plan, including, in addition to the issues discussed above, whether a bad debt deduction may be available with respect to their Claims and if so, when such deduction or loss would be available.

THE FOREGOING DISCUSSION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  ACCORDINGLY, HOLDERS OF CLAIMS OR INTERESTS SHOULD CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE TAX CONSEQUENCES OF THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX LAWS.

VIII.

RECOMMENDATION

The Debtors and the Committee strongly recommend that all creditors receiving a Ballot vote in favor of the Plan.  The Debtors and the Committee believe that the Plan is in the best interests of Creditors. The Plan as structured, among other things, allows Creditors with Allowed Claims to participate in distributions believed to be in excess of those that would otherwise be available were the Chapter 11 Cases dismissed or converted under Chapter 7 of the Bankruptcy Code and minimizes delays in recoveries to creditors.

FOR ALL THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT, THE DEBTORS AND THE COMMITTEE BELIEVE THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES. THE DEBTORS AND THE COMMITTEE URGES ALL CREDITORS ENTITLED TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY 4:00 P.M. EASTERN STANDARD TIME ON AUGUST 6, 2010.

Dated: June 9, 2010

eToys Direct 1, LLC; The Parent Company; BabyUniverse, Inc.; Dreamtime Baby, Inc.; eToys Direct, Inc.; PoshTots, Inc.; eToys Direct 2, LLC; eToys Direct 3, LLC; Gift Acquisition, L.L.C.; and My Twinn, Inc.

By: /s/ Charles A. Goodrich
       Name: Charles A. Goodrich
       Title:  CEO

Submitted by:

| Counsel for Debtors and Debtors in Possession: | Counsel for Official Committee of Unsecured Creditors: |
|---|---|
| /s/ Michael R. Seidl | /s/ Schuyler G. Carroll |
| PACHULSKI STANG ZIEHL & JONES LLP | ARENT FOX LLP |
| Laura Davis Jones (Bar No. 2436) | Schuyler G. Carroll |
| Jeffrey W. Dulberg (CA Bar No. 181200) | 1675 Broadway |
| Michael R. Seidl (Bar No. 3889) | New York, NY 10019 |
| 919 N. Market Street, 17th Floor | Telephone: 212-484-3900 |
| P.O. Box 8705 | Facsimile: 212-484-3990 |
| Wilmington, DE 19899-8705 | |
| Telephone: 302-652-4100 | -and- |
| Facsimile: 302-652-4400 | |
| | ELLIOTT GREENLEAF |
| | Rafael X. Zahralddin-Aravena (Bar No. 4166) |
| | 1105 Market Street, Suite 1700 |
| | Wilmington, DE 19801 |
| | Telephone: 302-384-9400 |
| | Facsimile: 302-384-9399 |

27